## GIAMALVA v. MARYLAND CAS. CO.
### Civ. A. No. 3964.

United States District Court
E. D. Louisiana, New Orleans Division.
Nov. 4, 1953.

Girard J. Fernandez, New Orleans, La., for plaintiff.

Deutsch, Kerrigan & Stiles, Marian Mayer, New Orleans, La., for defendant.

DAWKINS, Sr., District Judge.

Filed in the state court under the Workmen's Compensation Law, this case was removed here by defendant on the ground of diverse citizenship. Plaintiff testified that while working as a charwoman or janitress in the Eleanor McMain High School in the City of New Orleans, employed by the Orleans Parish School Board, she fell from a chair on which she was standing to perform her duties and bruised her lower abdomen severely; that her right breast or bust struck either the floor or some other object and caused it to turn a pinkish color; that no one else was present when she fell but that shortly after some of her co-workers appeared and she informed them of the extent of the accident and they saw the bruises and pinkish color of her breast. Further, that during the same afternoon she met the chief custodian or janitor of the building and reported the accident to him.

These fellow workers corroborate her statement, that is, the two female witnesses, stating that they saw the bruise and pinkish color of the breast, but the custodian did not recollect whether she had said anything about the latter or not. The fall occurred on Holy Thursday preceding Easter Sunday when most activities other than religious in the predominantly Catholic City of New Orleans are suspended, and the plaintiff did not see a doctor until the following Monday, or about four days later. This doctor verified her statement that she had a rather extensively bruised lower abdomen, but swore positively that she said

nothing about any injury to her bust and he saw no evidence of it. Following this over a period of three or four months, she visited the same doctor two or three times, and, on September 29th reported that the night before she had discovered a lump in her right breast which she claimed had been struck in the fall. On cross-examination Mrs. Giamalva rather frankly stated that she did not remember whether she had said anything to the doctor about striking her breast in the fall on previous visits until the last mentioned date. At that time he informed her that she should have a test made to determine whether this lump or tumor was malignant as quickly as possible. Mrs. Giamalva then went to her family physician, who confirmed the advice of the first doctor and on October 4th following submitted to an examination and laboratory test which supported the conclusion that the tumor was cancerous. This third doctor removed it, including apparently healthy tissue surrounding, estimating that the tumor itself was about one inch long and three-quarters of an inch in the other two dimensions excluding the tissue which was removed. He performed what was termed a radical operation, that is, removed the large muscles of the chest which are among the largest in the body and all of the tissue down to the rib bones as well as ligaments and glands in the armpit. It was his opinion and that of the other doctors who examined the microscopic findings, or who testified hypothetically, that the tumor was caught in its very early stage of malignancy and the patient's chances of cure were good. There has been complete healing and no adverse subsequent symptoms.

The doctor who did the operation first expressed the view that the lump in plaintiff's breast had not reached malignancy when she fell, but at the time he testified at the trial, changed his opinion and stated that because of the pathological report, placing the cancer in grades one and two instead of three or four (numbers arbitrarily used to fix the rate of progression), it developed very slowly, and he believed it had started some seven or eight months prior to the operation, that is, before April 10, 1952, the date of the accident, while the operation was performed October 4th of the same year. He stated in response to both direct and cross-examination that this was possibly true; but when pressed by the court as to whether he thought it probable, replied that he did. The doctor to whom plaintiff went originally and at least two others who testified, including a professor of pathology of Columbia University to whom slides were sent but never saw the patient, gave it as their opinions that malignancy had not existed prior to the fall. Of course, all conceded that no one could be positive about such matters. All the doctors testified it was the prevalent opinion of medical experts that a cancer could not be caused by a single blow, and gave it as their opinions, except the one who operated, that the traumatic injury to the breast, if it actually happened, had no influence whatever either in causing or aggravating the malignancy, if it previously existed.

The theory of the plaintiff is that the cancer had begun, was more or less dormant, but the blow caused it to flare up and progress more rapidly, and that the operation has disabled her from further performing the type of common labor which she had been doing for some twenty-three years, and was the only kind she was qualified to perform because of her lack of education. For this reason, in view of her age, she claimed total and permanent disability, has been placed upon a retirement compensation by the School Board and now lives with a daughter in a modest home owned by the two of them.

The case turns upon issues of fact, that is, whether the tumor had begun its formation, reached a condition of malignancy and was accelerated in its progress by the blow to plaintiff's breast (as her counsel insists); or whether an otherwise benign condition had become malignant as a result of the blow. Of course, the claim of total and permanent dis-

928

ability is the result of the operation and removal of the breast and surrounding muscles, etc., rather than the injury itself. The plaintiff simply contends that had it not been for this injury that operation might never have been necessary, or at least would have been substantially delayed.

■ Many decisions of the state courts disclose a very liberal attitude in workmen's compensation cases, both as to causes and extent of disability, influenced, no doubt, by the comparatively small possible recoveries. Of course, in this, as in all other civil cases, a plaintiff must prove his or her demand by a fair preponderance of the evidence, and in particular to make reasonably certain all material elements necessary to support a recovery. In all such cases, the court is compelled to rely upon the professional opinions of members of the medical profession.

Considering the cases cited by counsel for plaintiff: Custer v. Higgins Industries, La.App., 24 So.2d 511, 512, the contention of defendant was, as here, that there was no injury, and secondly, that if there was, it did not accelerate the cancerous tumor from which the deceased was suffering. The court found as a matter of fact and law there was an injury within the meaning of the compensation law, Act No. 20 of 1914, as amended, LSA–R.S. 23:1021 et seq. It was shown "that on that day (of injury) he was working with an assistant in trying to adjust a skylight hatch door, and that in doing so he was pushing it into place with his hands while his elbows pressed against the right side of his abdomen. It is shown, too, that his assistant * * * left the work for a few moments and that when he returned Vath told him that he had hurt himself and that when Legendre asked him how he had sustained the injury, he answered: 'Well, I had my elbows like this and was pushing against it'," and illustrated by placing his elbows against his body and stated that he had felt a sharp pain in his side which caused him to sit down. He continued to work for some nineteen or twenty days but found it necessary to visit a doctor occasionally. At the end of that time and on December 15, 1943 the doctor advised him that there was a large mass in his side and recommended he consult a surgeon. He went to the hospital and an operation was performed upon his abdomen. When it was opened the doctor "found the tumor to be irremoveable" and all that could be done was to apply X-ray treatment. This was done until his death on May 30th. His first pain was on November 26, 1943, and the advanced condition of the cancer was discovered when his operation was performed December 15th following. Doctor Matas gave it as his opinion that the "pressure had ruptured blood vessels supplying the tumor and thus caused it to develop more rapidly." Dr. Loria, who performed the operation in the present case testified that in his opinion the cancerous condition already existed in plaintiff's breast which made it possible for the blow to set in motion activities which speeded up its growth and caused the tumor to make its presence known, in the form of a lump in the upper part of the breast.

It would thus appear that in the Custer case the cancerous condition of Vath had reached an advanced stage and was of the type falling within the numbers three and four, the most rapidly developing, and blood vessels supplying it were easily ruptured as described by Dr. Matas and this brought about the condition which made the operation, in the opinion of the doctors, urgent. When the abdomen was opened, the situation exposed was immediately hopeless and it was merely a question of how long the patient could live. His death came in approximately five months.

In Austin v. Industrial Lumber Co., La.App., 8 So.2d 727, a hernia was involved and the court recites the testimony of three doctors and lay witnesses for the plaintiff, that his intestine came through the opening and had to be replaced; while three other doctors called for the defendant said he had no hernia, but did have a varicocele of the spermatic

cord on the left side. After reviewing the testimony of the opposing witnesses, the Louisiana Court of Appeal for the First Circuit disagreed with the District Court in its finding of fact that there was no hernia and found plaintiff was suffering from that type of malady and was thereby permanently disabled, allowing full recovery.

The question involved in that case was simply whether the plaintiff had or did not have a hernia, produced by the alleged accident, and, not as here, whether the alleged injury produced or accelerated a cancer. Besides the injury followed immediately the alleged strain accompanied by pain which it was claimed was caused by the hernia thus produced. In the present case the doctor says plaintiff made no complaint about injuring her breast and this she does not deny, until a few days before the operation which was some five or six months later, and must necessarily have been a very belated development from that injury. It was, according to her own doctor, and as stated earlier, in class one, the slowest developing type and, according to all of the doctors, was evidently caught at a very early stage. There is no one, except Dr. Loria, who says that it probably had started before she was injured, and this conclusion represented a change from his original view to the contrary. However much the court may sympathize with the plaintiff, can it reasonably be said that the evidence here preponderates in her favor?

Robichaux v. Realty Operators, Inc., 195 La. 70, 196 So. 23, 25, involved osteomyelitis, which followed the striking of an abscessed finger against a cane roller. The finger had to be amputated. The court states the circumstances of the injury as follows:

" * * * The plaintiff testified that, on the occasion of the injury, while he was piling the cane on the rows, and at the same time was trying to cross a cross-drain, or mud drain, as he called it, a pile of cane rolled back upon the pole and caused a severe shock or jar in the palm of his hand, or at the place which the doctors have described as 'the palmar surface of the proximal phalanx of the right index finger'. The plaintiff already had a callous growth at that place, which was developing into an abscess. The ailment was caused or at least aggravated by the plaintiff's chopping wood for his household use, several weeks before the accident happened. The plaintiff did no work after the accident happened. Three days afterwards he called upon the overseer for $4 with which to go to a doctor. The finger was swollen then to twice its normal size. The overseer asked what had caused the injury, and the plaintiff replied that he had made an abscess in his hand by chopping his winter wood. He called upon a doctor in the nearest town, but as it was then nighttime the doctor only dressed the finger and requested the patient to call again the next day. He did not call again, but eight days afterwards he went to the Charity Hospital in New Orleans, where, after several days of treatment and diagnosis, it was found that the case was one of osteomyelitis, for which nothing could be done but to amputate the finger. It was amputated on the sixteenth day after the patient was admitted to the hospital."

In this case there was an obvious and exposed prior condition which was aggravated by the injury and the sole question was whether it accelerated the osteomyelitis in view of its flaring up almost immediately after the accident.

Jackson v. Travelers' Insurance Co., 180 La. 43, 156 So. 169 involved a case of advanced syphilis which was likewise accelerated by an injury and caused the victim's death. There appeared to be no question about the presence of the disease in his system at the time of the injury.

In Broussard v. Union Sulphur Co., 5 La.App. 340, the employee was seriously injured on March 5th while carrying a heavy pipe along with others on his

shoulder. He complained immediately that the pain was acute in his shoulder joint and shoulder. During the night of that day he woke up and could feel soreness and the next morning when he went to work had a kernel under his arm which continued to swell until it was the size of a hen's egg. The next day he went back to work and the swelling at the end of ten days had decreased to about the size of a marble. Then on March 19th he had a similar accident when the same type of pain first experienced was felt. In July because of the acuteness of the pain he laid off, a short time later an operation was performed, and in November he died of cancer.

Brooks v. Lewis-Chambers Const. Co., Inc., 13 La.App. 402, 128 So. 321, and Ludd v. Van Hoose, 14 La.App. 276, 129 So. 375 involved diseases other than cancer.

In Causey v. Kansas City Bridge Co., La.App., 191 So. 730, the alleged injury happened on November 29th and the following is quoted from page 732 of 191 So.:

"The next question to determine is whether or not Causey's injury had the effect of activating the cancer from which he died. As set forth in the trial court's reasons for judgment, it is clear from the testimony of witness after witness, including fellow employees, relatives, and acquaintances, that prior to the accident Ralph Causey had always been in apparent good health and physically able and fit to do and perform hard manual labor, and that subsequent to the accident he went into a shocking and rapid decline; that he grew pale, weak and emaciated and his condition steadily grew worse until his death on February 5, 1938. Dr. Lorio, who acted as physician in examining company employees, testified that he was instrumental in securing employment for Causey with the defendant company, and that he was in normal health at the time he was employed. We agree with the trial judge that Ralph Causey's sudden lapse into complete disability on the occasion when he was unloading these heavy rocks, when always prior thereto he had been a vigorous, active, hard-working laborer, is rather convincing that he at that time suffered a severe strain which must necessarily have had serious effect on the cancerous growth. That conviction is strengthened by the medical testimony to the effect that a blow or strain could aggravate or activate a dormant cancerous growth."

Here again, the rapid development of the ailment tends to support the conclusion that the cancer was in an advanced state, and that the physical injuries virtually disabled the employee from the date they were received, November 29, 1937 until his death on February 5, 1938.

A careful consideration of all the facts and circumstances of this case leads to the conclusion that plaintiff has failed to prove by a fair preponderance of the evidence that the malignant tumor existed in her breast before she fell or that the accident had any effect whatever either in causing the cancer or accelerating its development, if it previously existed. The burden was upon her to prove her case by a fair preponderance of the evidence. Hogan v. Stovall Drilling Co., La.App., 55 So.2d 284. In other words, the weight of the evidence is against her claim and her demand will be denied.

Proper decree should be presented.